1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAVON SMITH, individually and on behalf of all others similarly situated, | Case No. 4:25-cv-10353 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., | |
| Defendant. | |

Plaintiff Shavon Smith ("Plaintiff") brings this action individually and on behalf of all others similarly situated ("Class Members") against Advance America, Cash Advance Centers, Inc. ("Defendant" or "Advance America").  Plaintiff's allegations are based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## **NATURE OF THE ACTION**

1.      This is a class action lawsuit brought on behalf of all Advance America account holders who have accessed and used www.advanceamerica.net (the "Website") to apply for a loan or cash advance.

2.      Defendant provides financial services to consumers through the Website it maintains, where Advance America account holders can manage and apply for loans and cash advances.  To apply for one of Defendant's financial products, users must share personally identifying information, including their name, email, loan application status, financial information and employment information.  When consumers provide this information on their applications, they expect that it will be protected and not disclosed to unknown third parties.  Such expectations are based, in part, on the legal protections afforded to such information.

3.      Despite reasonable expectations of privacy and Defendant's legal duties to prevent the disclosure of such private information, Defendant intercepts and discloses information provided by consumers on loan applications to LogRocket, Inc. ("LogRocket") and Google LLC ("Google"). These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA") and Cal. Fin. Code § 4050, et seq. (the "California Financial Information Privacy Act" or "CalFIPA").

4.      Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA") and the California Invasion of Privacy Act ("CIPA") §§ 631 and 632 by disclosing Plaintiff's and Class Members' private and confidential information without consent.

**PARTIES**

5.      Plaintiff Shavon Smith is a resident and citizen of Oakland, California.  On or around September 14, 2024, Plaintiff applied for a payday loan on the Website while logged into her private online account.  During the standard loan application process, Defendant required Plaintiff to submit her name, email address, employer information, and bank information.  Plaintiff applied for a payday loan using the same device and browser used to access her Google account.  Unbeknownst to Plaintiff, Defendant disclosed her personally identifiable information ("PII"), including her name, email address, employer information, bank information, and loan application status, to LogRocket and Google, as well as communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA and CalFIPA.  Neither Defendant nor LogRocket nor Google procured Plaintiff's prior consent to the sharing of her private and protected information.

6.      Defendant is a Delaware corporation with its principal place of business at 322 Rhett St., Greenville, SC 29601.  Defendant is a financial lender offering various services including personal loans, payday advances, emergency loans and more to individuals in several states, including California.  Defendant provides a variety of financial services to Californians, whom it knows to reside in the State based on address information that individuals must provide in order to open an account or apply for a financial product or service.  Defendant chose to embed the software codes for the tracking technologies on its Website, which it owns and operates.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because Plaintiff's state law claims are closely related to her federal claim.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

8.      This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court.  Further, the Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout California.  Additionally, Plaintiff, while in California, applied for a loan through Defendant's Website.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant transacts significant business within this District, Plaintiff resides in this District, and the acts that gave rise to this cause of action occurred within this District.

## FACTUAL BACKGROUND

### I.      The California Invasion of Privacy Act

10.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

11.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

12.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added, internal citations omitted).

13.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

14.     CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

15.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

16.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

17.     Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

**II.     The Gramm-Leach-Bliley Act and California Financial Information Privacy Act**

18.     As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

19.     Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

    (i)    Personally identifiable financial information; and

    (ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

20.    Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

    (i)    A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

    (ii)    About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

    (iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

    (A)    Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

    (B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

    (C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

    (D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

    (E)    Any information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F)    Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

21.    Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

22.    Pursuant to 16 C.F.R. § 313.3(k)(1), Advance America is a financial institution.

23.    In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

24.    Cal. Fin. Code § 4052(a) provides that:

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

25.    According to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(2)    Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3)    The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)    Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)    Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6)    Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

26.    "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

27.    Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential under both federal and California law.  Nonetheless, such information was intercepted in transit by the LogRocket and Google Analytics tracking code, as enabled by Defendant. Neither Defendant nor LogRocket nor Google procured Plaintiff's and Class Members' consent prior to this interception.

28.    This pattern of conduct by Defendant flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[1]

### III.    Overview of Defendant's Website

29.    Defendant owns and operates the Website.  Unbeknownst to consumers, Defendant has integrated the third-party tracking codes into the Website to assist with its marketing efforts.

30.    On the Website, users can, *inter alia*, log into their accounts to search for and apply for various loans.  When doing so, Website users provide Defendant with confidential information, including "nonpublic personal information" under the GLBA and CalFIPA, such as their PII (*e.g.*

---

[1] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

their name and email) and information about their financial activity with Advance America (*e.g.* loan approval status, banking and employer information).

31.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables LogRocket and Google to eavesdrop on those confidential communications.

32.    Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).  As set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections.  All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

**IV.    Defendant Discloses Consumers' Private Information Through The LogRocket And Google Analytics Tracking Code**

**A.    LogRocket's Advanced Session Replay User Tracking Technologies**

33.    As the name implies, Session Replay entails recording a user's behavior while they use a website, including what they type into forms, where they click, how their mouse moves, and more.

34.    The word "replay" is a misnomer because the user's interactions with the website are captured and transmitted to the session replay provider "at hyper-frequent intervals, often just milliseconds apart." *See India Price v. Carnival Corp.*, 712 F.Supp.3d 1347, 1360 (S.D. Cal. Jan. 19, 2024) (internal quotations omitted). Thus, the capturing and reading of user information occurs in real time and contemporaneously with the communication.

35.     LogRocket is a software company that develops, markets, and provides advanced Session Replay software, designed to record consumer interactions with websites in granular detail and in real time.[2]

36.     According to LogRocket's own marketing materials, its service "combines session replay, error tracking, and product analytics -- empowering software teams to create ideal product experiences across web and mobile apps."

37.     This technology allows companies to watch recordings of actual users interacting with their websites, capturing every movement and interaction.[3]

38.     In its documentation, LogRocket notes that "LogRocket automatically captures user behavior, network, performance, and log data with a single code snippet."[4]

39.     LogRocket does not compel website managers to install privacy safeguards, noting, for instance, that "All data captured **can be** sanitized for user privacy" (emphasis added).[5]

40.     Websites that use LogRocket Session Replay technology record user data through specific tracking mechanisms such as "Mouse Event" tracking and "Style Event" tracking, which record scrolling behavior, click patterns, hover actions, and form interactions, which effectively creates a video-like replay of a user's entire session.[6]

41.     The recording and data collection begins automatically the moment a user accesses or interacts with a website embedded with LogRocket technology.

42.     Users are not informed when recording begins, nor are they required to consent before the tracking commences.[7]

43.     All session recordings and collected user data are transmitted to and stored on LogRocket's servers, not the servers or computers of LogRocket's clients like Defendants.  This

---

[2] LogRocket, *About Us,* https://logrocket.com

[3] *Id.*

[4] *Data Collected*, https://docs.logrocket.com/docs/data-collected

[5] *Id.*

[6] *Session Replay*, https://logrocket.com/features/session-replay-developers/

[7] *Id.*

means that user data is not merely collected by the website owner but is transmitted to and processed by LogRocket as a third party.[8]

44.     Session Replay technology suffers from significant privacy flaws, as explained in an article from the Center for Information Technology Policy at Princeton University:

> the extent of data collected by these services far exceeds user expectations … text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user. This data can't reasonably be expected to be kept anonymous.[9]

45.     As the article goes on to note, "[c]ollection of page content by third-party replay scripts may cause **sensitive information such as medical conditions, credit card details and other personal information** displayed on a page to leak to the third-party as part of the recording," which "may expose users to identity theft, online scams, and other unwanted behavior."[10]

46.     Sensitive user information may be leaked for a multitude of reasons, including but not limited to the fact that (i) "[a]utomated redaction is imperfect; fields are redacted by input element type or heuristics, which may not always match the implementation used by publishers (e.g., information may be redacted when a form field auto-completes, but not when it is manually entered); (ii) page content may not be redacted, even if user inputs are; and (iii) websites operators must manually configure and label personal information to be redacted, which does not always occur.[11]

47.     Sessions recorded through LogRocket capture user PII including their User ID, IP address, and email, and user session details including their browser or device info and browser specific information (e.g. browser name, referrer, user agent, language).[12]

---

[8] *Id.*

[9] CITP Blog, *No boundaries: Exfiltration of personal data by session-replay scripts* (November 15, 2017), https://blog.citp.princeton.edu/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/

[10] *Id.* (emphasis added).

[11] *Id.*

[12] https://docs.logrocket.com/reference/react-native-identify

48.     LogRocket therefore creates specific identifying records (i.e. "User ID"), and records data specific to users' devices and activity (such as the user's IP Address, the version of the software used on an app or website, information about the user's web browser, information about the user's device, and other user traits) to specify individual users.

49.     LogRocket also offers specific documentation describing how it allows websites to create persistent user IDs to uniquely identify website visitors.[13]

50.     Users may be assigned unique identifiers based on "any string that uniquely identifies the user of your application, such as a database ID, an email, or a username."[14]

51.     LogRocket recommends that websites "use an immutable database ID [to track users] if available. Names and email addresses can be added as user traits as they could change."[15]

52.     When LogRocket tools capture user data from a host website, the Session Replay technology transmits both the user information and the user's id.

53.     Beyond capturing and reading a user's personal information, LogRocket also has the capability to analyze the captured information with a sophisticated suite of services, including its AI tool Galileo, and further disclose captured user information:

**Figure 1:**



---

[13] https://docs.logrocket.com/reference/identify

[14] *Id.*

[15] *Id.*

54.    Because LogRocket has the capability to "capture[], store[], and interpret[] [] real-time data," it is not like a tape recorder or "tool" used by one party to record another. *See Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021) (finding session replay provider was akin to "an eavesdropper standing outside the door").

55.    Instead, LogRocket —a separate and distinct third-party entity from the parties to the conversation (Plaintiff and Class Members, on the one hand, and Defendant, on the other)— eavesdrops upon, records, extract data from, and analyzes a conversation to which it was not a party.

56.    This is because LogRocket itself is collecting the content of any conversation.  That data is then analyzed by LogRocket in the manner alleged above before being provided to any entity that was a party to the conversation (like Advance America).

57.    LogRocket operates on Defendant's Website in the manner described above.  Thus, LogRocket captures Website users' electronic communications in real-time through its Session Replay feature and then has the capability to analyze those communications and divulge them to other third parties.

58.    LogRocket provides tracking software to its business partners in exchange for payment and deliberately designs its technology to be easily implemented by its clients through the insertion of JavaScript code into their websites.

59.    LogRocket derives direct financial benefit when lead generators like Defendant purchase and implement its services.  In turn, lead generators like Defendant benefit financially from sharing their users' data with LogRocket by enhancing their ability to optimize conversion rates, analyze user behavior patterns, and increase the effectiveness of their marketing and customer acquisition efforts.[16]

60.    Both LogRocket and Defendant receive material commercial and financial benefits from their partnership and from Defendant's implementation of LogRocket's tracking technology, all at the expense of website visitors' privacy rights.[17]

---

[16] LogRocket, About Us, https://logrocket.com/
[17] *LogRocket, Session Replay,* https://logrocket.com/features/session-replay-developers/

**B.  Google's Platform and Tracking Technologies**

61.   Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

62.   Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

63.   Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

> (a) <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

> (b) <u>Cookies</u>: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

> (c) <u>HTTP Response</u>: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

64.   A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

65.   Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

66.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The tracking technologies embedded on the Website by Defendant constitute Source Code and function is a substantially similar way.

67.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

68.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[18]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 2:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

69.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

70.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched

---

[18] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

71.     Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

72.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

73.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

74.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[19] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[20]

75.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Advance America users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages

---

[19] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[20] *Id.*

they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

76.    In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

77.    Thus, Defendant is essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties like Google.

78.    Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

79.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

80.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

81.    Google Analytics links with Google Ads so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[21]  Such practices were in effect on the Website at all relevant times.

82.    The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and protected financial information. Google received URLs that disclosed the pages and buttons customers accessed while navigating the Website.  These URLs contain protected financial information.  To illustrate, Google receives a URL that displays the loan application status of the loan applicants and if that loan is denied. Google also received additional PII, including the patients' IP address, device information, and User-IDs that correspond to their Google accounts.

83.    For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.[22]

84.    In addition to user-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

85.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

86.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[23]

87.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it

---

[21] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

[22] https://www.owox.com/blog/use-cases/google-analytics-client-id#:~:text=The%20Client%20ID%20(cid)%20or,unique%20users%20using%20this%20parameter.

[23] https://www.blog.google/products/chrome/building-a-more-private-web/

employs much more subtle techniques.[24]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

88.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[25]

89.    Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

90.    As enabled by Defendant, Google collects vast quantities of consumer data through its tracking technology.

91.    Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and user-IDs it intercepts and link such information to an individual's specific identity.

92.    Moreover, when email values for Gmail accounts are disclosed to Google, Google can easily match the data it obtains to the users existing Gmail account.

93.    Google then utilizes such information for its own purposes, such as targeted advertising.

C.    **How Defendant Disclosed Plaintiff's and Class Members' Protected Personally Identifiable Information and Financial Information Through LogRocket's and Google's Tracking Technology**

94.    Defendant Advance America is a corporation that focuses on providing financial loans, such as payday loans, to private customers.

95.    Defendant owns and operates the Website, where it encourages prospective customers to apply for its financial products and services.

96.    At all relevant times, Defendant's Website utilized LogRocket's and Google's tracking technologies.

---

[24] https://www.pixelprivacy.com/resources/browser-fingerprinting/

[25] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

97.     When consumers first sign up for an account on Defendant's Website, Defendant makes repeated representations that its application and portals are "secure areas."

**Figure 3:**



98.     Despite Defendant's own representations of privacy, as well as its legal duty to protect the private information provided by consumers, Defendant intercepts and discloses such information to unknown third parties without consumers' knowledge or consent.

99.     LogRocket's code, under the URL "http://r.lr-in-prod.com," is directly embedded into the source code of Defendants' Website, as shown below.

100.     This code activates automatically when a user visits the Website, initiating the recording process without any notification to the user.

101.     No visible notice, pop-up, banner, or other conspicuous disclosure informs consumers of this recording.

102.     Without obtaining consent from users, Defendant utilizes LogRocket's tracking technology to monitor, record, and access users' interactions with the site as they enter personal

1　information and discloses such information to LogRocket. The recording begins as soon as a user

2　accesses the Website.

3　　　　103.　　Request payload data from all of the pages on Defendant's Website confirms that

4　consumer interaction data, including where the user scrolls and clicks, is being intercepted and

5　recorded by LogRocket's software.

6　　　　104.　　Such information includes consumers' bank account information, their address,

7　employment, partial phone numbers, full name, email address, and loan application statuses.

8　**Figure 5:**



14　**Figure 6:**



20　**Figure 7:**



**Figure 8:**



**Figure 9:**



**Figure 10:**



105.    This interception and recording is consistent with LogRocket's descriptions of how its technology functions to record user data as the session occurs.

106.    Because the application pages on Defendant's Website operate by responding to consumer clicks related to sensitive information concerning their private financial information, the clicks on these pages are tantamount to unlawful disclosures and recordings of this information.

107.    Defendant knows that LogRocket captures the keystrokes, mouse clicks, and other communications of visitors to the Website.

108.    Defendant deliberately chose to implement this technology and pays LogRocket to supply this monitoring service.

109.    Pursuant to a commercial agreement with LogRocket, Defendant voluntarily embedded LogRocket's software code on the Website for marketing purposes.

110.    Consumers, including Plaintiff, have not been alerted to the presence of nor have they agreed to LogRocket's recording of their private and protected information.

111.     In its "Terms and Conditions," LogRocket grants itself a: "license to access and use Customer Data in order to provide the Services to Customer and to monitor and improve its services."[26]   Thus, LogRocket has the capability to use the recorded data it collects to monitor and improve its products and services.

112.     Defendant intercepts and discloses similar information to Google.

113.     Unbeknownst to consumers, Defendant also embedded Google's tracking technology on the Website to assist them with advertising services.

114.     Through Google Analytics, Defendant shared its applicants' identities and online activity, including information related to consumers seeking to procure financial loans, with one of the world's largest technology companies for targeted advertising purposes.

115.     Defendant allows and encourages consumers to apply for financial services on its Website.  Consumers can explore various types of loans available.  Once a consumer clicks "Loan Application", Defendant discloses the fact that the consumer is seeking loan services to Google.

---

[26] LogRocket, Terms And Conditions, https://logrocket.com/terms-and-conditions/.

1

**Figure 11:**

2



| Query String Parameters | View source | View URL-encoded |
|---|---|---|
| v | 2 | |
| tid | G-1LW81R6TP0 | |
| gtm | 45je59b0v9133715983z8889720287za200zb889720287zd889720287 | |
| _p | 1757970392567 | |
| _gaz | 1 | |
| gcd | 13l3l3l3l1l1 | |
| npa | 0 | |
| dma | 0 | |
| cid | 17537126.1748361792 | |
| ul | en-us | |
| sr | 3072x1728 | |
| ir | 1 | |
| uaa | x86 | |
| uab | 64 | |
| uafvl | Chromium;140.0.7339.127\|Not%3DA%3FBrand;24.0.0.0\|Google%20Chrome;140.0.7339.127 | |
| uamb | 0 | |
| uam | | |
| uap | Windows | |
| uapv | 19.0.0 | |
| uaw | 0 | |
| are | 1 | |
| frm | 0 | |
| pscdl | noapi | |
| _eu | EAAAAAQ | |
| _s | 4 | |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528500~104684208~104684211~104948813~105367987~105367989~105426769~105426771~115480709~115688283~115688285 | |
| sid | 1757970346 | |
| sct | 1 | |
| seg | 1 | |
| dl | https://web.advanceamerica.net/online/loan-application/step-one/personal-information | |
| dr | https://web.advanceamerica.net/online/dashboard | |
| dt | AA \| Loan Application Page \| Step One \| Personal Information | |
| en | pwa - NC - Step 1 - Personal Information | |
| _et | 17593 | |
| up.PID | 8f28884f-2ee4-41ee-9780-9f88df23e76c | |
| up.UState | CA | |
| up.PurposeID | 8f28884f-2ee4-41ee-9780-9f88df23e76c | |
| up.UserState | CA | |
| up.ZipCode | 91344 | |

116.    Defendant also discloses the status of the consumers' loan application, including whether the application is accepted or denied.

**<u>Figure 12:</u>**



117.    When users share their personal information with financial services, they expect this information to be kept confidential.  Moreover, when consumers seek a specific service from financial websites, they also expect the highly sensitive information they provide on their applications to be kept confidential.

118.    Through the above-listed Google technology, which the Defendant used via the software code installed, integrated and embedded into the Website, the Defendant disclosed its applicants' legally protected information.

119.    Defendant engages in this deceptive conduct for its own profit at the expense of its customers' privacy.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

## CLASS ALLEGATIONS

120.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the class period, applied for a loan on the Website.

**California Subclass:** All natural persons in the State of California who, during the class period, applied for a loan on the Website.

121.    Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

122.    The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

123.    **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Classes as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Classes are ascertainable and identifiable from Defendant's and Google's records.

124.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the

following: whether Defendant violated the ECPA, the CIPA §§ 631 and 632, the GLBA or CalFIPA, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

125.     **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to LogRocket and Google through the tracking technologies.

126.     **Adequate Representation:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

127.     **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CAUSES OF ACTION

### COUNT I
#### Violation of the Electronic Communications Privacy Act
#### 18 U.S.C. § 2511, *et seq.*

128.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

129.    Plaintiff brings this claim on behalf of herself and members of the Class.

130.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

131.    The ECPA protects both sending and the receipt of communications.

132.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

133.    The transmission of Plaintiff's PII and financial information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

134.    The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

135.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

136.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

137.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

138.    The following instruments constitute "devices" within the meaning of the ECPA:

a.    The computer codes and programs Defendant, LogRocket, and Google used to track Plaintiff and Class Members communications while they were navigating the Website;

b.    Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' mobile devices;

d.    Defendant's and LogRocket's web and ad servers;

e.    Defendant's and Google's web and ad servers;

f.    The plan the Defendant, LogRocket, and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

139.    Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

140.    By utilizing and embedding the tracking technology provided by LogRocket and Google on its website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

141.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by LogRocket and Google on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to LogRocket and Google.

142.    Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their name, email address, employment and banking information, and information related to the specific financial loan(s) they were applying for, as well as information related to their approval status of such loans.

This confidential information is then monetized for targeted advertising purposes, among other things.

143.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to LogRocket and Google through the tracking technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

144.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

145.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

146.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313.  This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party.  GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[27]

---

[27] 16 C.F.R. § 313

147.    Plaintiff's information that Defendant disclosed to LogRocket and Google qualifies as nonpublic personal information (including information related to their loan application, and loan application status), and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant specifically used the tracking technology provided by Google to track and utilize Plaintiff's and Class Members' PII and private financial information for financial gain.

148.    Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

149.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to Google without their knowledge or consent.

150.    The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

151.    As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631(a)**

152.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

153.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

154.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

155.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

156.    LogRocket's session replay technology and the Google Analytics code are "machine[s], instrument[s], contrivance[s], or … other manner[s]" used to engage in the prohibited conduct at issue here.

157.    LogRocket and Google are both "separate legal entit[ies] that offer[ a] 'software-as-a-service' and not merely a passive device."  *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, LogRocket and Google have the capability to use, and do use, the wiretapped information for their own purposes.  Accordingly, LogRocket and Google are third parties to any

communication between Plaintiff and California Subclass Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

158.    At all relevant times, LogRocket and Google willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and members of the California Subclass, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

159.    At all relevant times, LogRocket and Google used or attempted to use the communications intercepted to, *inter alia*, monitor and improve their products and services.

160.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled LogRocket and Google to wiretap Plaintiff and members of the California Subclass through the LogRocket session replay technology and Google Analytics code to accomplish the wrongful conduct at issue here.

161.    Plaintiff and members of the California Subclass did not provide their prior consent to LogRocket's and Google's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass members' electronic communications. Nor did Plaintiff and California Subclass members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling LogRocket's and Google's conduct.

162.    The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the Website and where the LogRocket session replay technology and Google Analytics tracking technology—as enabled by Defendant—routed Plaintiff's and California Subclass members' electronic communications to its servers.

163.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III

### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632

164.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

165.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

166.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

167.    The Google Analytics code is an "electronic amplifying or recording device."

168.    Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i)    Personally identifiable financial information; and

(ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

169.    Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)    A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)    About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

    (B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

    (C)    The fact that an **individual is or has been one of [a financial institution's] customers** or **has obtained a financial product or service** from [a financial institution];

    (D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that **indicates that the individual is or has been [a financial institution's] consumer**;

    (E)    Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account;

    (F)    Any **information [a financial institution] collect[s] through an Internet "cookie"** (an information collecting device from a web server); and

170.    Pursuant to Cal. Fin. Code § 4052(a):

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

171.    Pursuant to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

    (2)    Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3)    The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)    Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)    Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6)    Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

172.    "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

173.    Thus, Plaintiff's and California Subclass members' "nonpublic personal information" is confidential, under federal and California law.

174.    At all relevant times, Defendant assisted LogRocket and Google in eavesdropping upon and recording such confidential communications of Plaintiff and California Subclass members, on the one hand, and Defendant, on the other.

175.    When communicating with Defendant, Plaintiff and California Subclass members had an objectively reasonable expectation of privacy, based on the GLBA and CalFIPA. Thus, Plaintiff and California Subclass members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and California Subclass members.

176.    Plaintiff and California Subclass members did not consent to any of LogRocket's or Google's actions. Nor have Plaintiff or California Subclass members consented to any of LogRocket's or Google's intentional use of an electronic amplifying or recording device to

eavesdrop upon and record the confidential communications of Plaintiff and California Subclass members.

177.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

<u>**COUNT IV**</u>
**Invasion of Privacy Under California's Constitution**

178.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

179.    Plaintiff brings this claim on behalf of herself and members of the California Subclass against Defendant.

180.    The highly sensitive and personal information of Plaintiff and California Subclass members consists of private and confidential facts and information regarding Plaintiff's and California Subclass members' financial services that were never intended to be shared beyond private communications on the Website and the consideration of financial professionals.

181.    Plaintiff and California Subclass members had a legitimate expectation of privacy regarding their PII and financial information and were accordingly entitled to the protection of this information against disclosure to unauthorized third Parties, such as LogRocket and Google.

182.    Defendant owed a duty to Plaintiff and California Subclass members to keep their PII and financial information confidential.

183.    Defendant's unauthorized disclosure of Plaintiff's and California Subclass members' PII and protected financial information to LogRocket and Google is highly offensive to a reasonable person.

184.    Defendant's willful and intentional disclosure of Plaintiff's and California Subclass members' PII and financial information constitutes an intentional interference with Plaintiff's and California Subclass members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

185.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and California Subclass members' privacy because Defendant facilitated LogRocket's and Google's simultaneous eavesdropping and wiretapping of confidential communications.

186.    Defendant failed to protect Plaintiff's and California Subclass members' PII and financial information and acted knowingly when it installed the tracking technology onto the Website because the purpose of said technology is to track and disseminate users' communications on the Website for marketing and advertising.

187.    Because Defendant intentionally and willfully incorporated the tracking technology onto the Website and encouraged individuals to use and interact with the Website and the services thereon, Defendant had notice of and knew that this practice would cause injury to Plaintiff and the California Subclass.

188.    As a proximate result of Defendant's acts and omissions, the PII and financial information of Plaintiff and California Subclass members was disclosed to Google, causing Plaintiff and the California Subclass to suffer damages.

189.    Plaintiff, on behalf of herself and California Subclass members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

190.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the California Subclass since their PII and financial information is still maintained by Defendant and is still in the possession of LogRocket and Google, and the wrongful disclosure of this information cannot be undone.

191.    Plaintiff and California Subclass members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third party's continued possession of their sensitive and confidential information.  A judgment for monetary damages will not undo Defendant's disclosure of the information to unauthorized third party who, upon information and belief, continue to possess and utilize the information.

192.    Plaintiff, on behalf of herself and California Subclass members, further seeks injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and California Subclass members' PII and financial information and to adhere to its common law, contractual, statutory and regulatory duties.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  December 2, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:___*/s/  Philip L. Fraietta*_____

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606

Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*